## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KENNETH LAMPKIN,

     *Plaintiff*,               CASE NO. 2:13-CV-15264-AC-PTM

*v.*

COMMISSIONER OF           DISTRICT JUDGE AVERN COHN
SOCIAL SECURITY,         MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

decision denying Plaintiff's claim for Supplemental Security Income ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 15.)

Plaintiff Kenneth Lampkin was forty-six years old at the time of the administrative hearing on September 13, 2012. (Transcript, Doc. 6 at 8, 120.) Plaintiff worked in general labor and manufacturing before his alleged disability onset. (Tr. at 154.) Plaintiff filed his claim for SSI on July 11, 2011, alleging that he became unable to work on February 11, 2011. (Tr. at 120-28.) The claim was denied at the initial administrative stage. (Tr. at 44.) In denying Plaintiff's claim, the Commissioner considered malnutrition (weight loss), human immunodeficiency virus ("HIV"), and affective disorders. (*Id.*) On September 13, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Patrick J. MacLean, who considered the application for benefits *de novo*. (Tr. at 8-43.) In a decision dated October 1, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 53-70.)

On October 29, 2013, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On December 27, 2013, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

**B.    Standard of Review**

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through

2

the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.     The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Title II, 42 U.S.C. §§ 401-434, provides Disability Insurance Benefits ("DIB") to qualifying wage earners who become disabled prior to the expiration of their insured status;

Title XVI, 42 U.S.C. §§ 1381-1385, provides SSI to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

4

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.     The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff had not engaged in substantial gainful activity since July 11, 2011, the application date. (Tr. at 58.) At Step Two, he found that Plaintiff's conditions of HIV and depressive disorder were "severe" within the meaning of 20 C.F.R. §§ 404.1520, 416.920. (*Id.*) At Step Three, he found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 58-60.) At Step Four, he found that Plaintiff could perform sedentary work with several limitations and was therefore unable to perform any past relevant work. (Tr. at 60-65.) He also found that Plaintiff was forty-five years old on the application date, putting him into the "younger individual" range of eighteen to forty-four years old. (Tr. at 65.) At Step Five the ALJ found that there were jobs existing in the regional economy in significant numbers that Plaintiff could perform, and therefore, found that Plaintiff was not disabled. (Tr. at 66.)

### E.     Administrative Record

1.     **Medical History**

On December 8, 2010, Dr. Juanita Abreu-Lanfranco confirmed that Plaintiff had been diagnosed with an HIV infection and that as of December 1, 2010 his CD4 was 328 and his Viral Load ("VL") was 88500; he was being treated with Atripla. (Tr. at 198.)

Plaintiff was treated by University Physicians Group from February 15, 2010 to August 27, 2012. (Tr. at 207-27, 233-46.) At all of his appointments Plaintiff was negative for or there was no mention of fatigue. (*Id.*) On February 15, 2010, a report shows that Plaintiff had been diagnosed with HIV two months prior while he was in prison. (Tr. at 211.) He was set to be released from prison a week from this report. (*Id.*) His VL was 41000, his CD4 was 454, his creatinine was normal, and he had no symptoms of HIV. (*Id.*) A review of symptoms showed Plaintiff was, among other things, negative for diarrhea and psychiatric symptoms. (*Id.*) Upon examination, there was "[n]o unusual anxiety or evidence of depression." (Tr. at 212.) Plaintiff weighed 176 pounds. (*Id.*) On April 21 Plaintiff's CD4 was 378 and his VL was 88500; a review of symptoms showed Plaintiff was negative for diarrhea and psychiatric symptoms. (Tr. at 214.) Plaintiff weighed 183 pounds at this visit. (Tr. at 215.) Again there was "[n]o unusual anxiety or evidence of depression" upon examination. (*Id.*) On June 16 Plaintiff's CD4 was 663 and his VL was 249. (Tr. at 217.) He was again negative for diarrhea, upon examination there was "[n]o unusual anxiety or evidence of depression," and he weighed 177 pounds. (Tr. at 217-18.) Plaintiff's list of medication consisted of hydrochlorothiazide, for his "borderline elevated" blood pressure, and Atripla, for his HIV. (Tr. at 218-19.) On December 1 there was no CD4 or VL number reported. (Tr. at 220.) He complained about a "left[-]sided headache" at this visit; the doctor specifically noted, however that he denied diarrhea. (*Id.*) He weighed 184 pounds at this visit. (*Id.*)

On his March 3, 2011 appointment his CD4 was 663 and his VL was 249. (Tr. at 223.)
He had "recently broke up with his partner, and fe[lt] a little depressed." (*Id.*) He weighed 176
pounds and did not list diarrhea among his complaints. (Tr. at 223-24.) On June 29 Plaintiff's
CD4 was 378 and his VL was 88500. (Tr. at 225.) At this appointment, Plaintiff reported that
he had been having "watery diarrhea over several months"; he denied any blood or tar in his
stool and had no abdominal pain or cramping. (Tr. at 226-27.) He weighed 161 pounds; it was
noted that he had lost weight, but his appetite had been "good." (*Id.*) Plaintiff was told to bring
a stool sample to the next appointment. (Tr. at 227.) There is nothing in the record indicating
that Plaintiff brought a stool sample or that any sample was tested. There is nothing in the
medical record from this date to show he complained about depression. (*See* Tr. at 225-27.)

On January 25, 2012, Plaintiff was "feel[ing] depressed and "overwhelmed with his
life"; he had suicidal ideation at times, but no other complaints. (Tr. at 244.) He was negative
for diarrhea and weighed 156 pounds. (Tr. at 244-45.) He was referred to behavioral services
and started on fluoxetine to treat his depression. (*Id.*) On May 14 Plaintiff's CD4 was 725 and
his VL was less than 48. (Tr. at 233.) Plaintiff was not feeling depressed anymore and listed no
complaints. (*Id.*) He was negative for diarrhea and depression and he weighed 155 pounds. (Tr.
at 233-34.) His medication list was fluoxetine, Atripla, and hydrochlorothiazide. (Tr. at 234.)

On April 13, 2011 Plaintiff met with Matt Sweet, LMSW, asking for psychotherapy "to
cope with feelings of depression." (Tr. at 199.) Sweet diagnosed Plaintiff with "Major
Depressive Disorder, Recurrent, Moderate, without full interepisode recovery." (*Id.*) He gave

Plaintiff a Global Assessment of Functioning ("GAF") score of 50-55.[2] (*Id.*) Plaintiff was afraid of dying, had anxiety, and had feelings of worthlessness. (Tr. at 200.)

On December 10, 2011, Plaintiff received a psychiatric evaluation and mental status examination from Someswara N. Navuluri, M.D., at Detroit East, Community Mental Health Center. (Tr. at 247-48.) He had been having problems with depression for a few years but had never seen a psychiatrist. (Tr. at 247.) He denied suicidal thoughts and hallucinations. (*Id.*) Plaintiff reported having finished high school. (*Id.*) Plaintiff's speech was clear and coherent, his thinking was clear and goal directed, he was not psychotic, his affect was shallow, his mood was anxious and sad, and he was emotional. (*Id.*) He was diagnosed with depressive disorder and was assigned a GAF of 60. (Tr. at 248.)

Plaintiff was "doing well" at his January 5, 2012 appointment; he was taking Celexa and another unnamed medication and was not having side effects. (Tr. at 255.) His "depression and anxiety were lifting and his sleep was improving." (*Id.*) "During the interview, patient was alert, cooperative, . . . appropriate," he was not psychotic, he was not depressed, he was stable medically, and his judgment was good. (*Id.*) At his February 15 appointment, Plaintiff was "doing well," was taking Celexa and Trazadone with no side effects, "his [d]epression and anxiety [were] lifting," and he was stable medically. (Tr. at 254.) His status was the same for his March 14, April 20, and May 17 appointments and his hygiene and grooming also started improving. (Tr. at 251-53.) At his June 14 appointment he was taking Celexa and Desyrel and

_____

[2] A GAF score of 51 to 60 indicates "Moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

was not having problems with the medications. (*Id.*) He was seen again on July 12, 2012 and said he had been "doing well." (Tr. at 249.) He continued taking Celexa and Trazodone and reported no side effects. (*Id.*)

On September 6, 2011, Plaintiff saw John Jeter, MA, and Hugh Bray, Ph.D., for a mental status consultative examination. (Tr. at 228-32.) His "grooming, hygiene[,] and dress were appropriate." (Tr. at 229.) He reported taking Rapitidine, Atripla, and hydrochlorothiazide daily. (*Id.*) He reported taking three naps a day and sleeping from 10:00 p.m. to 8:00 a.m. (Tr. at 230.) He had a "picky" appetite, did "light housekeeping," attended no social groups, did not shovel snow, did not have a driver's license, could do laundry, could cash checks and pay bills, did not take walks or exercise, completed his own grooming and hygiene, read and watched television, shopped, completed errands, and cooked simple meals. (*Id.*) He reported having completing the twelfth grade. (*Id.*) Plaintiff responded to instructions and positive criticism "well," he needed "no special assistance to complete the examination process," overall he was "cooperative and verbally responsive," his eye contact was "good," his thoughts were "logical, organized, simple, and concrete," the content of his communication was "age appropriate," and his mood was "depressed." (*Id.*) He denied suicidal and homicidal ideations. (*Id.*) His thought content was appropriate and there was "no apparent thought disorder noted." (*Id.*) In the doctor's opinion, "Based upon today's examination, [Plaintiff's] ability to understand and carry out simple directions [was] not impaired." (Tr. at 231.) He was diagnosed with an "[a]djustment [d]isorder with [d]epressed mood, and assigned a GAF score of 58." (Tr. at 232.)

**2.    Function Reports**

On July 29, 2011 Plaintiff's case manager, Jennifer Vanaman, completed a third party function report. (Tr. at 163-70.) She had known Plaintiff for seven months. (Tr. at 163.) She said that Plaintiff's illness affected his ability to work because "HIV can cause chronic inflammation—claimant has difficulty working for prolonged periods of time." (*Id.*) She noted "Depression makes it very difficult for claimant to get out of bed and [become] motivate[d]." (*Id.*) On a typical day, Plaintiff "spends time with the family, [and] lays in bed." (Tr. at 164.) He did not provide care for anyone else except sometimes he helped with his nieces. (*Id.*) Before his condition he was able to work regular hours. (*Id.*) His condition affected his ability to sleep because he sometimes had insomnia and other times slept too much. (*Id.*) He did not have problems with personal care. (*Id.*) He prepared his own meals, which consisted of simple foods, like sandwiches. (Tr. at 165.) He helped with cleaning the house. (*Id.*) Plaintiff went outside "[a]t least every 4-5 days." (Tr. at 166.) He would walk or use public transportation when he traveled. (*Id.*) He did not drive. (*Id.*) He shopped in stores occasionally for groceries and it took him about an hour. (*Id.*) Plaintiff's hobby was to watch television, which he did daily. (Tr. at 167.) He spent time with others, mostly at home with his family. (*Id.*) He had to be reminded to go places. (*Id.*) She indicated Plaintiff's "[d]epression causes significant issues with concentration[,] memory[,] and completing tasks. [Plaintiff] describes feeling 'foggy.'" (*Id.*) She said he could pay attention for one to two hours, that he "sometimes" finished what he started, that he followed written and spoken instructions "very well," that he got along with authority figures "okay," and that he did not handle stress well. (Tr. at 168-69.)

On August 1, 2011 a person named Kimberly Lampkin, (Tr. at 182), completed an adult function report on Plaintiff's behalf. (Tr. at 171-82.) Plaintiff's depression and illness interfered with his ability to work because his family and friends treated him differently, he

had a lack of energy and will power, he was not allowed to work with food machines, and he had lost interest. (Tr. at 176.) On a typical day he would sleep long periods of time, stay in bed most of the day, he did not typically watch television or read, and sometimes he would cry for no reason. (Tr. at 175.) He also indicated that he had poor hygiene. (*Id.*) Before his illness he could work, socialize, laugh, and he had good hygiene. (*Id.*) For his personal care he said that dressing was not a problem but that he had lost interest in bathing, caring for his hair, and shaving. (*Id.*) He needed someone to make him bathe and groom himself. (Tr. at 177.) He prepared his own meals, usually sandwiches or frozen foods. (*Id.*) He was unable to do housework or yardwork because of lack of energy, mood swings, and illness. (*Id.*) Plaintiff did not go out at all because he did not want to be around people. (Tr. at 178.) He did not shop, have any hobbies, spend time with others, or go anywhere on a regular basis, because he had no energy. (Tr. at 178-79.)  He had problems getting along with others because of his mood swings. (Tr. at 180.) He indicated that his illness affected talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (*Id.*) He did not finish what he started. (*Id.*) In the section asking "How well do you follow written instructions," Kimberly Lampkin wrote "I can't read." (Tr. at 180.) He followed spoken instructions "somewhat." (*Id.*) He did not indicate any side effects from the medications he was taking. (*Id.*)

### 3.     Plaintiff's Testimony at Administrative Hearings

At the administrative hearing, on September 13, 2012, Plaintiff testified about his condition. (Tr. at 8-43.) Plaintiff discovered he had HIV around December 10, 2009. (Tr. at 13.) Plaintiff had problems with depression, anger, and fatigue: he preferred to stay by himself. (Tr. at 17.) He had problems with diarrhea and felt that he was "constantly running to the

bathroom." (Tr. at 18.) He estimated that on a typical day he went to the bathroom four to five times. (*Id.*) He did not take anything to prevent the diarrhea. (*Id.*) He thought the HIV medicine caused problems with his eyes and also caused his diarrhea. (*Id.*) He said that the doctors believe the HIV is causing the diarrhea. (*Id.*) He had lost thirty pounds since being diagnosed with HIV. (Tr. at 21.)

The last time he had worked was December 2010 as a machine operator for Eclipse Molding. (*Id.*) He stopped working because of frequent diarrhea-related bathroom breaks. (Tr. at 23.) To explain his frequent breaks, Plaintiff told his supervisor that he had HIV and his coworkers discovered his condition; he got embarrassed and quit because he "didn't want to deal with it." (Tr. at 24.) He never worked anywhere after this incident. (*Id.*) He did not think he could work a "sit-down job" because he was unable to stay focused long enough. (*Id.*) He thought it would help if he could alternate between sitting and standing. (Tr. at 25.) However he did not think he could do even that kind of job for eight hours because he would need to take too many bathroom breaks. (*Id.*)

He was taking daily medicines for the HIV, for his depression, for high blood pressure, and for his sleeping problems. (Tr. at 25-26.) Side effects included nervousness and weird dreams and thoughts. (Tr. at 27-28.) He was seeing his doctor every three weeks for his HIV and was being treated about once a month for his depression. (Tr. at 28.) He had never been hospitalized for complications from the HIV or for depression or anxiety. (*Id.*) He estimated he only slept for three hours at night. (*Id.*) He was able to take care of his personal needs. (*Id.*) If he needed transportation, his twenty-five-year-old son would bring him because he did not have a driver's license. (Tr. at 29.) He did not do any housework or yardwork and did not have any hobbies. (*Id.*) He sometimes had problems sitting or standing for extended periods of time;

at those times, he estimated he could only sit or stand for about thirty minutes before he needed to change positions. (Tr. at 30.) Lying down on his side was the most comfortable position for him. (Tr. at 31.) He estimated he could only lift and carry about fifteen pounds. (*Id.*)

He also had problems with his right hand because he had been stabbed. (Tr. at 32.) His memory was not very good because of the medicine. (Tr. at 33.) He could only stay focused for about thirty minutes when he watched television shows. (*Id.*) He was not able to finish things that he started. (*Id.*) He did not get along well with others: he threw tantrums and got mad "real quick." (*Id.*)

### 4.    Vocational Expert Testimony at Administrative Hearing

The ALJ asked the Vocational Expert ("VE"), Scott B. Silver, a series of questions based on hypothetical individuals with Plaintiff's age, education, and work experience. (Tr. at 36-43.) The first hypothetical individual

> was able to lift up to 20 pounds occasionaly; lift or carry up to 10 pounds frequently; and light work as defined by the regulations; avoid all use of moving machinery; avoid all exposures and unprotected heights; no climbing ladders, ropes or scaffolds; occasionally climb ramps or stairs, stoop, kneel and crawl. [He] [w]ould need to be near a restroom. His work would be limited to simple, routine and repetitive tasks.

(Tr. at 37 (sic throughout).) The ALJ then asked if there would be jobs available in the national economy for the first individual. (Tr. at 38-39.) The VE said he would not be able to answer the hypothetical question with the restroom limitation because the Dictionary of Occupational Titles ("DOT") did not address it. (*Id.*) The ALJ removed the "near the restroom" limitation from the hypothetical and the VE testified that the individual could not do Plaintiff's past relevant work, but that there would be jobs available. (Tr. at 39-40.) The first individual would be able to work as an usher (100,000 jobs nationally) or an office helper (80,000 nationally). (Tr. at 39.)

In addition to the above limitations, the second hypothetical individual could only "lift up to ten pounds occasionally in sedentary work as defined by the regulations . . . ." (Tr. at 40.) The VE first testified that he still could not analyze whether the person needed to be "near a restroom," so the ALJ asked him to "delete that limitation." (*Id.*) Examples that the second individual could do included a surveillance monitor (91,000 nationally) and an order clerk (200,000 nationally). (*Id.*)

The third hypothetical individual had the same limitations as the second, but also "[d]ue to a combination of medical conditions and associated symptoms and mental impairments, this person would be off task more than 20 percent of an eight-hour workday and, therefore, [would be] unable to engage and sustain work activity for a full eight-hour workday on a regular and consistent basis." (Tr. at 41.) The VE testified that all work would be precluded. (*Id.*) He said, "A person is allowed one day off a month with a physician excuse"; a typical break within an eight-hour shift would be fifteen minutes within the first four hours, a half hour break, and fifteen minutes within the last four hours. (*Id.*) Exceeding these limits would "eliminate all the jobs [the VE cited] and all work in the competitive workplace." (Tr. at 41-42.) All the VE's testimony was consistent with the DOT. (Tr. at 42.)

### F.      Governing Law and Analysis

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545.

### 1.      Legal Standard

The ALJ determined that Plaintiff had the RFC

> to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except the claimant is unable to climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, crouch, kneel, crawl, and climb ramps or stairs. The claimant should avoid all exposure to chemicals, use of moving machinery, and exposure to unprotected heights. The claimant is limited to simple, routine, and repetitive tasks.

(Tr. at 60.) Sedentary work

> Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*,

15

167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a.    *Hypothetical, RFC, Opinion Evidence, and Credibility Assessment*

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-03p, 2006 WL 2329939, at *2. When "acceptable medical sources" issue these opinions, the regulations deem the statements to be

"medical opinions." 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. 20 C.F.R. § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of this medical opinion evidence, including any treating source opinions that have not been given controlling weight. 20 C.F.R. § 404.1527(c). The ALJ should use the same analysis for "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Further, an ALJ must give a treating physician's opinions regarding the nature and severity of a claimant's impairments controlling weight when it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544. Matters that are reserved to the Commissioner are not "medical opinions" so they do not receive this deference. 20 C.F.R. § 404.1527(d)(2). Additionally, a physician's notations of a claimant's subjective complaints is the "'opposite of objective medical evidence'" and the ALJ need not give the opinions based solely on those assertions controlling weight. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). The regulations also require an ALJ to provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

The regulations establish the following two step process for evaluating subjective symptoms, including pain. SSR 96-7p, 1996 WL 374186, at *2; *see also* 20 C.F.R. § 404.1529. First, the ALJ determines "whether there is an underlying medically determinable . . .

impairment," that is, "an impairment[] that can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the individual's . . . symptoms." *Id.* If there is not, then the symptoms "cannot be found to affect the individual's ability to do basic work activities." However, if the symptoms "could reasonably be expected to produce the individual's symptoms," the ALJ moves on to the second step of the process. *Id.* At the second step, the ALJ evaluates the "intensity, persistence, and limiting effects" of the symptoms to determine how much they limit the claimant's "ability to do basic work activities." *Id.* Either a claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms are substantiated by objective medical evidence and the ALJ accepts them, or the ALJ makes a credibility assessment with respect to the claimant's statements to determine the symptom's actual intensity, persistence, and limiting effects. *Id.*; *see also Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

While a claimant's description of symptoms alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a), an ALJ may not disregard a claimant's subjective complaints about the severity and persistence of symptoms simply because substantiating objective evidence is lacking. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of confirming objective evidence regarding the severity and persistence of symptoms forces an ALJ to consider these factors:

> (i) . . . [D]aily activities; (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms; (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms; (vi) Any other measures . . . used to relieve . . . pain or other symptoms.

18

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

"An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [a claimant] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). At Step Five, the burden shifts to the Commissioner, who must prove that "other work exists in the national economy that plaintiff can perform." 20 C.F.R. §§ 404.1520, 416.920. "Substantial evidence may be produced through reliance on the testimony of a [VE] in response to a 'hypothetical' question, but only 'if the question accurately portrays [Plaintiff's] individual physical and mental

19

impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). The hypothetical is valid if it includes all *credible* limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

    **b.**  ***Analysis***

      i.  *The ALJ's Credibility, Opinion Evidence, and RFC Assessments*

    Plaintiff contends, "There is absolutely no rationale nor discussion of [Plaintiff's] medical problems in the ALJ's decision. . . . [It] cherry-picks the evidence in an effort to paint the Plaintiff in a bad light." (Doc. 12 at 11.) "The ALJ's failure to give specific reasons and explain precisely how those reasons affected the weight accorded the opinion is a legal error requiring reversal. (*Id.*) Plaintiff also argues "There is not a scintilla of evidence to support [the ALJ's] RFC assessment that Mr. Lampkin would be capable of work at the sedentary exertional level. The ALJ never factors or even attempts to factor Mr. Lampkin's severe fatigue, severe pain, need to lie down, or severe medication side effects." (Doc. 12 at 12.) He goes on to assert, "The ALJ states that he does not find claimant credible; however, the ALJ never discusses or evaluates Mr. Roberts [sic] subjective complaints under [the relevant factors]." (*Id.* at 12-13.) These essentially amount to arguments that the ALJ failed to give rationale for the weight he accorded the medical opinion evidence and for his credibility assessment.

    With respect to the first argument, Plaintiff does not point to any medical opinion evidence in the record that the ALJ ignored, accorded the improper amount of weight, or did not provide good reasons for the weight given. The only medical opinion evidence that

Plaintiff cites is the opinion evidence from Dr. Bray. (Doc. 12 at 12) Plaintiff mistakenly asserts that Dr. Bray limited Plaintiff's ability to "understand and carry out simple instructions": Plaintiff states that "Dr. Bray the consultative examiner[,] which the ALJ gave significant weight, Plaintiff would be limited to simple directions . . . ." (Doc. 12 at 12.) However, Dr. Bray actually stated "[Plaintiff's] ability to understand and carry out simple directions [was] not impaired." (Tr. at 231.)

The ALJ's analysis of the opinion evidence was mostly in Plaintiff's favor. He discounted the state agency's opinions that Plaintiff could do work at the light exertional level, could lift twenty pounds, and that his affective disorder was not severe (Tr. at 45-52) because evidence at the hearing indicated that the combination of physical and mental impairments caused more limitations than assessed by the state's medical consultative examinations. (Tr. at 62-63.) He gave the opinion that Plaintiff was depressed and had a GAF score of 60 (Tr. at 248) significant weight because it was "well supported by the clinical findings, [and was] consistent with the recitation of claimant's activities and level of functioning." (Tr. at 63.) Consistent with the weight given to each of these opinions, the ALJ reduced Plaintiff's RFC from the light exertional level to the sedentary exertional level and added a simple, routine, and repetitive tasks limitation. (Tr. at 60, 62-63.)

The ALJ also accorded Dr. Bray and Dr. Jeter's opinion that Plaintiff was able to understand and carry out simple directions "significant weight because it [was] well supported by the objective findings as noted and [was] consistent with the overall evidence of record." (Tr. at 63.) The ALJ had already noted during his credibility assessment (Tr. at 61) that while Plaintiff stated in his function report that he "could not read," (Tr. at 180), Plaintiff's case manager said he followed written instructions "very well." (Tr. 168-69.) Further, Plaintiff

21

graduated from high school, which makes his contention that he is unable to read implausible. (Tr. at 230, 247.) Therefore, after reviewing the record, I suggest that the ALJ thoroughly explained his reasons for the weight he accorded all the medical opinion evidence and that substantial evidence supported his findings.

I also suggest that substantial evidence supports the ALJ's credibility assessment. The ALJ started with Plaintiff's statement that "he [was] unable to work due to symptoms of HIV infection and depression." (Tr. at 61.) He then laid out much of Plaintiff's testimony at the hearing and in his function report. (*Id.*) He noted that Plaintiff stated that he could not read in his function report and then considered that Plaintiff's case manager said he followed written and oral instructions "very well." (*Id.*) The ALJ then found that "[t]he medical records [did] not support the claimant's allegations of disabling limitations. Although the claimant believes that he is disabled because he is unable to work without limitations, the longitudinal medical history and his testimony demonstrate that [he] has retained the [above] [RFC]." (*Id.*) The ALJ noted that Plaintiff "consistently denied any fatigue, . . . or diarrhea," and that "the physician also found the claimant to be well nourished despite losing fifteen pounds." (Tr. at 62.) The ALJ also noted, "In May 2012, the claimant had 'no complaints' and did 'not feel depressed anymore.'" (*Id.*) He considered that Plaintiff's depression had improved. (*Id.*)

The ALJ found that "the degree of symptoms and limitations as alleged by the claimant due to fatigue, diarrhea, and depression [were] not consistent with the objective medical evidence," which "weigh[ed] heavily against the claimant's allegations as set forth." (Tr. at 64.) "The diagnostic and objective physical and psychological examination findings do not support the claimant's complaints of severe symptoms associated with HIV infection or mental illness. . . . Laboratory tests indicate the claimant responded well to anti-viral therapy and

physical examination[s] reveal the claimant was essentially asymptomatic." (*Id.*) Further, "In May 2012, the claimant reported he no longer felt depressed," and the "psychiatric treatment notes indicate the claimant was doing well with his depression and anxiety was 'lifting.'" (*Id.*) The ALJ also noted the inconsistencies between the record and Plaintiff's testimony. For example, he noted that Plaintiff had testified that he quit his job because he was embarrassed about his diarrhea in December, 2010, however during this time he was denying diarrhea symptoms at his physical examinations. (Tr. at 21, 64, 220, 223.) The ALJ concluded, "The claimant's testimony [was] not well supported by the objective medical evidence in the record for the relevant time and while given appropriate consideration, it was not given significant weight." (Tr. at 65.)

The record supports the ALJ's analysis. Plaintiff denied, or did not mention, fatigue at all of his visits to University Physician's Group. (Tr. at 207-27; 233-46.) He denied diarrhea at all but one of his visits. (Tr. at 211, 214, 217, 220, 223, 244.) On December 1, 2010 Plaintiff complained about a headache but not diarrhea or depression. (Tr. at 220.) Plaintiff stated in his hearing testimony, however, that the last time he worked was in December 2010 and that he left that job because he had to go to the bathroom all the time. (Tr. at 21.) Likewise, Plaintiff denied depression at most of his visits to University Physician's Group. (Tr. at 212, 215, 218, 225-27, 233.) His treatment at Detroit East, Community Mental Health Center showed that his depression began lifting as soon as January 5, 2012. (Tr. at 255.) And on May 14, 2012, Plaintiff said that he was no longer depressed. (Tr. at 233.) Further, the medical record is bereft of complaints regarding side-effects. At Detroit East, he consistently denied complaints about the side-effects of his medications. (Tr. at 247-55.) Further, Plaintiff did not indicate any side

effects from his medicine in the space provided for side effects on his function report. (Tr. at 180.)

ii.      *Concentration, Persistence, and Pace in RFC*

Plaintiff first attacks the ALJ's RFC by arguing that it failed to account for his moderate limitations in concentration persistence and pace. (Doc. 12 at 12.) He contends that "there are no non-exertional limitations whatsoever in the ALJ's RFC determination that would account for his severe impairment findings, just generic findings of 'simple, routine, and repetitive tasks.'" (*Id.* (quoting Tr. at 60).)

Plaintiff's argument is "not uncommon and the case law resolves it both ways." *Hernandez v. Comm'r of Soc. Sec.*, No. 10-cv-14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011) (collecting cases). The *Hernandez* court stated that

> a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace . . . . However, the Court also finds that there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of, for example, "unskilled work" but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's hypothetical and RFC assessment.

*Id.* at *10 (citations omitted). In some cases courts will remand when an ALJ's "hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks," but "other cases have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation." *Taylor v. Commissioner of Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011) *report and recommendation adopted*, No. 10-12519, 2011 WL 2682892 (E.D. Mich. July 11, 2011).

24

The RFC limited Plaintiff to sedentary work and "simple, routine, and repetitive tasks." (Tr. at 60.) As discussed above, the ALJ did not find credible Plaintiff's assertion that he could not read and had problems following written instructions. (Tr. at 61.) The ALJ gave significant weight to the opinions of Dr. Bray and Dr. Jeter that Plaintiff's "ability to understand and carry out simple directions [was] not impaired. (Tr. at 63, 231.) On the other hand, there is some evidence in the record to support at least some limitations in Plaintiff's RFC. Plaintiff did indicate in his function report that his condition affected talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. at 180.) Further, his case manager stated in the third party function report that Plaintiff had to be reminded to go places, that his condition affected his memory, completing tasks, and concentration. (Tr. at 166-68.) She added "Depression causes significant issues with concentration[,] memory[,] and completing tasks," and that Plaintiff described "feeling foggy." (*Id.*) After looking at the record as a whole, I suggest that substantial evidence supported the ALJ's RFC assessment. As noted above, Plaintiff's allegations were not entirely borne out by the evidence, while the consultant's opinions were well supported.

### G.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

### III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 27, 2015     /S PATRICIA T. MORRIS
            Patricia T. Morris
            United States Magistrate Judge